No. 22-1714

_____

# In the United States Court of Appeals
# for the First Circuit

_____

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**EDISON BURGOS-MONTES**
*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Puerto Rico
Case No. 06-CR-09-JAG-1
Hon. Jay A. García-Gregory, U.S. District Judge

_____

## APPELLANT'S REPLY BRIEF

_____

**RACHEL BRILL**
Federal Public Defender
District of Puerto Rico
241 F.D. Roosevelt Ave.
San Juan, PR 00918
T. (787) 281-4922
F. (787) 281-4899
E. Alejandra_Bird@fd.org

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

**ALEJANDRA BIRD-LÓPEZ**
Assistant Federal Public Defender

*Attorneys for Defendant-Appellant*
**EDISON BURGOS-MONTES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

ARGUMENTS AND AUTHORITY....................................................2

I.   THE UNDERLYING CRIMINAL CONDUCT IS IRRELEVANT TO THE
     ISSUES RAISED IN OUR BRIEF..............................................2

II.  THIS COURT SHOULD NOT DISMISS THIS APPEAL FOR WANT OF
     JURISDICTION WITHOUT OFFERING MR. BURGOS AN OPPORTUNITY
     TO ADDRESS ANY RESIDUAL DOUBTS ON THE MATTER. ........................3

III. THE GOVERNMENT FAILS TO SHOW THAT THE DISTRICT COURT
     PROPERLY CONCLUDED THAT MR. BURGOS WAS RECEIVING
     ADEQUATE MEDICAL CARE AFTER ARRIVING AT FCC COLEMAN. ..........3

     A.  Generalized conclusions offered by BOP physician
         Venuto do not controvert Dr. Bren's specific
         assessment. ..............................................................4

     B.  The government attempts to defeat Dr. Bren's medical
         conclusions by moving the target. .......................................15

     C.  The government's attack on Dr. Bren forgets that Dr.
         Venuto was not Mr. Burgos's treating physician either. .....18

     D.  Crediting Dr. Venuto's assessment of adequate
         treatment does not amount to a discretionary choice
         between competing experts...................................................19

     E.  The relevance of Mr. Burgos's "lifestyle" and "choices"
         to Dr. Bren's conclusions......................................................21

     F.  The government clings to improper waiver arguments
         that cannot carry the day......................................................29

     G.  On this record, the court was not free to ignore Dr.
         Bren's conclusions. ................................................................32

H.    Mr. Burgos does not argue that the court was required to grant compassionate release..............................................35

CONCLUSION ................................................................................36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ................. 3

*Compagnie De Rassurance D'Ile de France v. New Eng. Reinsurance Corp.*, 57 F.3d 56 (1st Cir. 1995) ............................... 20

*Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271 (1st Cir. 2003) ..................................................................................... 35

*Feliciano v. Barcelo*, 497 F. Supp. 14 (D.P.R. 1979) .............................. 28

*Gagliardi v. Sullivan*, 513 F.3d 301 (1st Cir. 2008) ............................... 21

*Gray v. Cummings*, 917 F.3d 1 (1st Cir. 2019) ....................................... 34

*Mendez v. Breckon*, No. 7:20-CV-00046, 2021 WL 4268890 (W.D. Va. Sept. 20, 2021) .......................................................................... 27

*Ortega-Candelaria v. Johnson & Johnson,* 755 F.3d 13 (1st Cir. 2014) ................................................................................................. 34

*Parrilla v. United States*, 841 F.2d 16 (1st Cir. 1988) ............................ 32

*Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62 (1st Cir. 2002) ........................................................................................... 34, 35

*Santana v. United States*, 572 F.2d 331 (1st Cir. 1977) ................... 32, 33

*Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016) ................................ 28

*United States v. Rivera-Rodríguez*, 75 F.4th 1 (1st Cir. 2023) ............... 21

*United States v. Williams*, 509 F. Supp. 3d 6163 (S.D.W. Va. 2020) ..... 27

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) .............................. 29

## OTHER AUTHORITIES

Afsharian, Parisa. "Beyond the Food: How Prison Nutrition Policy Contributes to Lasting Chronic Disease." Brown Undergraduate Journal of Public Health, Brown School of Public Health, (3 May 2023) ........................................................ 25

Center for Disease Control webpage on Cholesterol (accessed 1 May 2024) ...................................................................................... 13

Criminon, "What Are Prison Lockdowns and Why Are They Used?" Criminon, Criminon International (25 Jan. 2024) ............ 24

Donovan, John. "Prison Food Is Way Worse than You'd Expect." HowStuffWorks, (17 May 2019) .................................................... 25

Kuss, B., Lopez, N.V., Hardy, S.T., Spilkin, A., Brauer, J., Phillips, R., Delio, G. and Camplain, R "Sodium content of menu and commissary provisions in rural jail exceeds heart-healthy dietary recommendations," International Journal of Prisoner Health (25 November 2021) .................................................... 25, 26

Laura M. Rosenboom, Rebecca J. Shlafer, Jamie L. Stang, and Lisa J. Harnack, Evaluation of the Nutritional Quality of Commissary Foods Offered in American Women's Prisons, Journal of Correctional Health Care. Volume 24, Issue 3 (1 July 2018) ...................................................................................... 25

Nargi, Lela. "Bad Prison Food Can Cause Health Problems That Linger after Release." In These Times, (12 Apr. 2022) ................ 25

Pauly, Madison. "The Surprising Benefits of Serving Prisoners Better Food." Mother Jones, (3 Mar. 2019) .................................... 25

## SENTENCING GUIDELINES

U.S.S.G. § 1B1.13(b)(1)(B)(i) ........................................................ 28

U.S.S.G. § 1B1.13(b)(1)(C) ............................................................ 28

No. 22-1714

# In the United States Court of Appeals for the First Circuit

———————————

**UNITED STATES OF AMERICA,**
*Appellee,*

v.

**EDISON BURGOS-MONTES**
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Puerto Rico
Case No. 06-CR-09-JAG-1
Hon. Jay A. García-Gregory, U.S. District Judge

————————————————————————————————

## APPELLANT'S REPLY BRIEF

————————————————————————————————

TO THE HONORABLE COURT:

Defendant-Appellant Edison Burgos-Montes (Mr. Burgos), represented by the Federal Public Defender, District of Puerto Rico through undersigned counsel, respectfully states and prays:

ARGUMENTS AND AUTHORITY

## I. The underlying criminal conduct is irrelevant to the issues raised in our brief.

The issues in this appeal are (1) whether the order on review is a final decision for appeal purposes, and (2) whether the court below erred in concluding that Mr. Burgos is receiving adequate medical care. AB3, AD1.[1] The court below explicitly disavowed consideration of other factors relevant to the sentencing reduction analysis. AD1.

Nevertheless, the government opens its brief by launching into an extensive recounting of the trial evidence against Mr. Burgos, G1-G7, in what can only be interpreted as an attempt to draw focus away from the errors committed below and predispose this Court against him. The details surrounding the underlying conviction have nothing to do with the limited legal and factual questions raised here. For now, at least, they are beside the point and should not be considered in determining this appeal.

---

[1] Citations: Appellant's Addendum ("AD__"); Appendix ("A__"); Sealed Supplemental Appendix ("SA__"); Appellant's Brief ("AB__"); Government's Brief ("G_").

## II.  This Court should not dismiss this appeal for want of jurisdiction without offering Mr. Burgos an opportunity to address any residual doubts on the matter.

Both a prior filing and our principal brief discuss at length why this Court has jurisdiction over the present case. *See* AB17-AB30; Appellant's Response to Court Order, No. 22-1740 (Jan. 1, 2023). The government agrees that the order being appealed from is final and that this Court has jurisdiction over the appeal. G17-G20.

We are mindful that this Court has "a special obligation to satisfy itself … of its own jurisdiction … even though the parties are prepared to concede it." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) (internal quotations omitted). So, while we are confident that the Court has jurisdiction based on the parties' pleadings, we request that any lingering doubts as to jurisdiction be referred for supplemental briefing prior to any ruling denying jurisdiction.

## III.  The government fails to show that the district court properly concluded that Mr. Burgos was receiving adequate medical care after arriving at FCC Coleman.

As our opening brief shows, the court below erred in crediting unsupported and generalized allegations that Mr. Burgos was receiving adequate care *vis-a-vis* the medical record and the specific findings of a

physician, factors that should have been entitled to significant weight. AB31-AB45. He argues that the court's failure to appropriately weigh the evidence constituted an abuse of discretion.

### A. Generalized conclusions offered by BOP physician Venuto do not controvert Dr. Bren's specific assessment.

Over the course of nine pages, G24-G32, the government spins an elaborate and convoluted explanation of why the court below "properly rejected Dr. Bren's concerns based on the record before it." G25. It imagines and then proposes undisclosed reasons that might have led BOP physician Gary Venuto to make the generalized representation that Mr. Burgos was receiving adequate care—even though Dr. Venuto's letters give no clue of those reasons. The government also supposes the district court's reasoning, even though it was left unarticulated in its order.

Dr. Bren, who evaluated and reported on this case *pro bono*, is a board-certified physician certified in Internal Medicine and in Cardiovascular Disease. SA29. He has served as full-time medical faculty at George Washington School of Medicine as an Associate Professor of Medicine (Cardiology) and Emergency Medicine and has been in private

practice for 35 years. SA29. He assessed over two years' worth of Mr. Burgos's BOP medical records. The government claims that since his review covered only the first two weeks that Mr. Burgos was housed at his current institution, FCC Coleman, Dr. Bren's assessment of Mr. Burgos's treatment was "no longer valid," because "his treatment changed." G24, G36.

The government says that, after arriving at FCC Coleman on September 22, 2021, the institution's "'medical team did not modify his care in order to maintain continuity of care until the medical team could fully evaluate [him].'" G24. Therefore, the government claims, Dr. Bren's letter could not "account for any of the changes in care that Burgos received at FCC Coleman," after those two weeks. G24, G37. The claim of a material change to treatment is inaccurate.

For example, Dr. Bren's assessment observed that Mr. Burgos's hypertension was poorly controlled, and that the adjustment of his antihypertensive medications was "slow and without logical basis," exposing Mr. Burgos to a host of grave risks to his health over time. SA29, SA32. As an example, he pointed out that, while consistent readings far in excess of target blood pressure levels had already caused detrimental

changes to Mr. Burgos's heart structure, he was taken off the highest available dose of one antihypertensive medication (Amlodipine) and given the lowest available dose of another (Nifedipine). SA29.

The medical record shows that on September 20, 2021, prior to arriving at Coleman, Mr. Burgos's daily antihypertensive regimen consisted of 600 mg of Labetalol, 100 mg of Losartan, 30 mg of Nifedipine, and 20 mg of Furosemide. SA653-SA660, SA464 n.3. On October 20, 2021, when the government says the Coleman medical team reevaluated Mr. Burgos's regimen, the BOP medical team prescribed the same regimen, SA653-SA660, except for a modest increase in the dose of Nifedipine to 60 mg. SA659-SA660. This is even after a after a month of sky-high blood pressure readings. *See* SA737.

The government's claim that the doctors at FCC Coleman also added 600 mg of labetalol, G25, is incorrect. That medication was prescribed before Mr. Burgos arrived at Coleman. SA657-SA658. So, the government's claim that Mr. Burgos's treatment "materially changed," G24, and Dr. Bren's concerns were "effectively addressed," G25, is not supported by the record.

The government next says that Dr. Bren "ignored" the prescription of several other antihypertensive medications and so must have "misread" Mr. Burgos's medical records or "took issue with the dosage of only one of his blood pressure medications." G25. This inaccurately represents Dr. Bren's letter that concludes that the hypertension treatment is "slow and without logical basis," SA29, followed immediately by the phrase, "[f]or example," when discussing the unwarranted replacement of the highest available does of Amlodipine with the lowest available dose of Nifedipine. SA29. This is simply an example of the BOP's inadequate management of Mr. Burgos's hypertensive treatment, not the only problem with it.[2]

In opposing Dr. Bren's assessment, Dr. Venuto did not say, as the government does now on appeal, that Dr. Bren misread or failed to account for other antihypertensives prescribed. In fact, Dr. Venuto said

---

[2] The government knows this because, in a follow up letter (filed after compassionate release was denied), Dr. Bren observed that Mr. Burgos is prescribed "6 different medications for hypertension including 3 different diuretics (for which there is little rationale) and most of his medications are prescribed at submaximal doses," an approach Dr. Bren criticizes as "inadequate and inappropriate." SA782.

nothing to explain *why* Dr. Bren was wrong or *why* Mr. Burgos's treatment was appropriate. SA463-SA470. He merely distanced himself from Mr. Burgos's prior treatment, affirming that, as a Level 3 Care facility, FCC Coleman was providing "timely and appropriate medical care." SA464.

The fact that BOP doctors at Coleman later tinkered with another antihypertensive medication dosage five months later, G26, and then two months after that, G26, while the unabating off-the-charts blood pressure readings continued, G26, SA737, is entirely consistent with a finding that Mr. Burgos's treatment for hypertension is "slow and without logical basis," SA29. The "without logical basis," is borne out by the fact that the modification in treatment was entirely ineffective. SA737. But, beyond that, Dr. Venuto could have addressed the "logical basis" of the regimen in his letter by explaining why this treatment made medical sense or, at least, made sense in Mr. Burgos's case, or how it comports with the standard of care. A defense of Mr. Burgos's treatment is entirely absent from Dr. Venuto's letters, SA406-SA407, SA463-SA468, even though the Coleman clinical director would presumably have the expertise to provide

such an explanation, not the attorney representing the government in this appeal.

Most saliently, Dr. Bren's letter points out the BOP's failure to provide Mr. Burgos a CPAP (continuous positive air pressure) machine, which is without dispute "potentially live saving treatment" for sleep apnea and is implicated in Mr. Burgos's hypertension. SA33. Over the many months this matter was litigated, the BOP did not provide this CPAP machine. SA777. Neither the government nor physician Venuto's letters dispute that this is potentially life-saving treatment, that sleep apnea can cause or exacerbate hypertension[3] or that use of a CPAP machine is the standard of care. SA29-SA33, SA406-SA407, SA463-SA470.

The government claims that Dr. Bren's conclusions about the failure to treat Mr. Burgos's sleep apnea with a CPAP machine was "rendered factually baseless after his transfer to FCC Coleman." G28. Though its argument is confusingly elaborated, it appears the

---

[3] In fact, the government adopts the position taken by Dr. Venuto's letter (and the medical community), acknowledging that sleep apnea can be a "root cause" of hypertension. SA328, SA407, SA432.

government is relying on the BOP's failure to confirm the sleep apnea
diagnosis, to argue that it did not need to treat this life-threating
condition. G28. It criticizes Dr. Bren for assuming Mr. Burgos has sleep
apnea. G28.

These are the facts:

| DATE | FACTS | RECORD REFERENCE |
|------|-------|------------------|
| Oct. 2020 | BOP makes provisional diagnosis of sleep apnea and referral for a sleep study. | SA30, SA166 |
| Jun. 2021 | Months later, the sleep study is conducted. | SA30, SA84, SA87 |
| | Mr. Burgos is orally informed that the results of the study confirmed his sleep apnea diagnosis, but the results are apparently not documented in his medical record. | Proffered at SA30 |
| Oct. 2021 | After arriving at Coleman, another sleep study is ordered. | SA57-SA58 |
| Nov. 2021 | The motion for compassionate release is filed in the district court. | SA1-SA34 |
| Apr. 2022 | Even without the sleep study, BOP contracted doctor recommends CPAP machine "ASAP" for treatment of elevated blood pressure | SA555-SA556, SA710 |
| May 2022 | BOP physician Venuto indicates that a sleep study is "soon" to be performed, "to rule out the possibility of obstructive sleep apnea as a root cause of [Mr. Burgos's] hypertension," (not poor diet, as later alleged) | SA406-SA407 |

| June 2022 | Mr. Burgos is hospitalized for 2 days due to a hypertensive crisis. | SA466 |
| July 2022 | Sleep test was still pending. | SA464 |
| Aug. 2022 | The court credits "Dr. Gary Venuto's assessment that Defendant is receiving adequate medical, dental and psychological care since arriving at FCC Coleman." | AD1 |

As this timeline shows, Mr. Burgos received a "provisional" sleep apnea diagnosis in October 2020. By July 2022, confirmatory sleep tests were still pending. This is almost two years after Mr. Burgos's original provisional diagnosis, *almost a year after being transferred to Coleman (under Dr. Venuto)*, a Level 3 Care facility, and over six months after the compassionate release motion was filed. It is also weeks after Mr. Burgos had a hypertensive crisis that landed him in the hospital. SA448-SA450. Multiple filings referred to this issue. SA30, SA285, SA304, SA308, SA313-SA314, SA328, SA432, SA457, SA738, SA759-SA760, SA772, SA777.

So, Dr. Venuto's "Level 3 Care" facility was unable, for almost a year, to perform a sleep study or provide Mr. Burgos with a functioning CPAP machine, a potentially life-saving treatment in accordance with the standard of care. SA30, SA777-SA778. Yet the court below "credit[ed]

Dr. Gary Venuto's assessment that Defendant is receiving adequate medical… care since arriving at FCC Coleman." AD1.

The BOP's inability or unwillingness to confirm a diagnosis is not a very good excuse for failing to treat this disease, especially when a BOP contracted doctor recommended use of a CPAP machine "ASAP" even without the sleep study. SA555-SA556, SA710. The government never made this argument below and the court, of course, did not say that it was relying on it when it made its decision. The long delay in confirming the presumptive diagnosis only serves to show the BOP can't or won't provide adequate care to Mr. Burgos.

In the same vein, the government imagines why Dr. Bren's analysis about the BOP's handling of Mr. Burgos's chest pain is wrong: because, in the government attorney's lay opinion, a prescription for a nitrate preparation should work just fine. G29. Again, Dr. Venuto, presumably a trained physician,[4] never articulated, much less endorsed, the reasons given by the government on appeal, SA406-SA407, SA463-SA470, the

_____

[4] Unlike the defense, *see* SA29, the government did not describe or proffer Dr. Venuto's credentials or certifications.

government never made this argument below, and the court never reached this conclusion, AD1.

The government has a similarly interesting theory, one that was never offered below by anyone, about Dr. Bren's assessment regarding Mr. Burgos's cholesterol treatment. G30-G31. Dr. Bren's observation regarding the treatment of elevated LDL[5] is that a medication that was working reasonably well was replaced for the wrong reason with another at a dosage yielding suboptimal results. SA30-SA31. The government says LDL levels of 121 and 124 are fine despite Dr. Bren's judgment that an appropriate target for Mr. Burgos is 100 or 70, SA30, and the medical record's mentioned goal of 90.[6] Once more, Dr. Venuto never said this, although he had *every* opportunity to explain why Dr. Bren might be wrong or to explain the BOP's treatment—but didn't. We pressed this

_____

[5] High levels of LDL cholesterol, sometimes called "bad" cholesterol, raises the risk for heart disease and stroke. Center for Disease Control webpage on Cholesterol, https://www.cdc.gov/cholesterol/ldl_hdl.htm (last accessed May 1, 2024). This adds to Mr. Burgos's already increased risk due to hypertension and untreated sleep apnea. SA29-SA30, SA32.

[6] The medical record contains a comment "LDL 90, at goal" though the record contains only laboratory results showing higher readings. SA56, SA223, SA685.

issue in multiple filings, SA286-SA287, A738-SA739, SA772, SA778, SA784 and neither Venuto nor the government responded until this appeal.

In summary, the government's position is loaded entirely upon the shoulders of this appeal with medical theories and reasoning never endorsed by any countervailing expert or argued by the government below. Since it cannot rely on Dr. Venuto's analysis—because there was none—the government cobbles together a proposal of what it believes could pass for medical "common sense" based on non-expert pseudo medical reasoning in response to the evaluation of learned physician, Dr. Bren. Meanwhile, the BOP physician with access to relevant information and expertise to respond provided no insight. The government's argument on appeal is thus based on "possible" reasoning the court below never expressed, built on facts the court never found, assumed from a BOP physician's letter that did not contest Dr. Bren's medical conclusions or provide any of its own, and argument centered on contentions it never made below.

**B.**   **The government attempts to defeat Dr. Bren's medical conclusions by moving the target.**

As stated, the government claims Dr. Bren's conclusions all became "baseless" after the BOP shuttled Mr. Burgos to FCC Coleman because Coleman is a Level 3 Care institution and because the BOP made changes to his treatment. G26, G28. Accepting its claim at face value without more would make it impossible for a federal judicial officer to evaluate an inadequate-care claim. If affirmed, this case would provide a roadmap to defeat such claims. All the BOP must do is tweak treatment slightly or transfer an inmate. This would neutralize opinions about care fixed in a particular point in time, especially if the BOP has multiple opportunities to respond to an expert statement, as here, over the course of nine months. A1-A7.

This connects with the related but separate issue of "temporarily course-correct[ing] in response to a motion for compassionate release, with no guarantee that adequate medical services will be available later on." AB28. Though the government claims the BOP has not course-

corrected here, G25 n.6,[7] it is suspect, that Mr. Burgos's transfer to a Level Care 2 facility was pending since January 2021, SA126, but his transfer took place in August 2021—just after counsel sent a letter to the BOP requesting compassionate release based on his health problems. SA25-SA29, SA74-SA77.

The government claims we "appear to recognize that a compassionate-release argument based on the medical care at a particular facility is rendered moot once the inmate is transferred to another facility." G24 n.8. No. But we recognize that the government will use superficial changes to maneuver on pretense that it has addressed real problems with sham solutions as it has done here.

To be clear, our motion was not based on "medical care at a particular facility." SA5-SA15. It was based on the care Mr. Burgos was receiving in the BOP system. SA5-SA15. It is the government that

---

[7] The government refers to "changes in treatment" in October 2021, before filing of the compassionate release motion in November 2021. As indicated, only one change was implemented at Coleman then: a modest increase in Nifedipine from 30 to 60 mg a day. SA56-SA57. Other minor adjustments to Mr. Burgos's pharmaceutical regimen postdate his arrival by several months.

belatedly raised the argument that the care received was improved based only on the fact that Mr. Burgos was moved to a facility with a higher "care level." *Compare* SA406-SA407, *with* SA463-SA464.

The government could just as easily have argued that a change in the medical director or staff at an institution makes our contentions about care obsolete. This is one part of the moving target we were forced to aim at and strike for nine months in response to the repeated opportunities the district court afforded the government to augment its paltry arguments in the proceedings below. See e.g., A9-A13.

What is particularly revealing is that, even after nine months of litigation, with ample opportunity to "course correct," the BOP was still unable or unwilling to adequately address Mr. Burgos's hypertension, either through appropriate revision of his pharmacological regimen or treatment with a CPAP machine. SA772. This failure puts his long-term health and even his life at risk. SA737-SA738. This risk is far from speculative; it was aptly demonstrated by the hypertensive crisis that required Mr. Burgos to be hospitalized a month and a half before the court below denied his motion. SA466, SA448-SA450, AD1. Still, the

court below "credit[ed] Dr. Gary Venuto's assessment that Defendant is receiving adequate medical... care since arriving at FCC Coleman." AD1.

## C. The government's attack on Dr. Bren forgets that Dr. Venuto was not Mr. Burgos's treating physician either.

The government attacks Dr. Bren's assessment on the basis that he did not "treat Burgos, meet with him" or talk to BOP physicians but merely "reviewed" "medical records" and opined "on the quality of the care that Burgos had received...." G23. But that is also true of Dr. Venuto. Dr. Venuto does not claim he examined or met with Mr. Burgos or gathered information from his treating physicians beyond performing a "chart review."[8] SA406-SA407, SA463-SA468, SA538.

The government says that Dr. Bren's letter contrasts with Venuto's in that the latter acknowledges that he cannot comment on the medical care at USP Pollock because he lacked inside knowledge of the treatment decisions and how they evolved based on interactions with the patient.

---

[8] As a private physician Dr. Bren is not generally authorized to meet with or examine a federal prisoner. But Dr. Venuto is "Clinical Director" of the BOP facility where Mr. Burgos is warehoused. A463. Surely, he could have met with and examined Mr. Burgos or gathered information from treating physicians. His letters to the district court reflect no such efforts.

G23. Evidently treatment is partly based on patient-doctor interactions. But diagnosis and treatment must be evidence-based be grounded in medical knowledge. If a treatment approach makes no medical sense, patient-doctor interaction is beside the point.

But it is interesting that Dr. Venuto claims that a chart review alone is insufficient to form an opinion about treatment. SA463. He nevertheless seems perfectly comfortable making judgments about the treatment at Coleman (all good), even though he doesn't reference any access to information beyond a bare medical record. SA406-SA407, SA463-SA470. On this record, then, Dr. Venuto's contention of adequate treatment is ostensibly based on the blind trust in his staff, and not on any medical expertise or information.

## D. Crediting Dr. Venuto's assessment of adequate treatment does not amount to a discretionary choice between competing experts.

It is not correct, as the government implies, that the district court here simply chose between competing experts. G28. Worse, the very case that the government cites for this proposition, *Compagnie De Rassurance D'Ile de France v. New Eng. Reinsurance Corp.*, 57 F.3d 56,

77 (1st Cir. 1995), resulted in a ruling that found error in the lower court's election of one one expert's conclusions over another.

It is true that the Court's opinion acknowledged the standard that an appellate court is "normally" bound by the district court's choice among competing experts. *Id.* But, in that insurance fraud case, this Court found clear error in the adoption of a narrow definition of an insurance contract term promoted by plaintiffs' experts over a broad definition given by defendants' experts. *Id.* The choice was erroneous in part because the plaintiffs' expert testimony did not contest the relevant part of the defendants' expert testimony. *Id.* at 77 n.21 ("none of plaintiffs/experts categorically denied the widespread use" of a broader understanding of the term.).

Here, the government has never shown that any part of Dr. Venuto's letters or Mr. Burgos's medical record contradict or cast doubt on Dr. Bren's specific medical conclusions. And in fact, Dr. Venuto does not address these at all, asserting merely they are no longer relevant. SA463. He attempts to counter Dr. Bren's letter only by offering "bald assertions," "subjective characterizations," "unsubstantiated conclusions," "problematic suppositions," and "outright vituperation,"

none of which have any force when weighed against Dr. Bren's *specific* and *concrete* findings. *See Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008).

Not only does the medical record fail to contradict Dr. Bren's conclusions; it shows that his observations about deficient treatment continued. That is, Mr. Burgos' pharmacological treatment, the inability to control his hypertension and the failure to provide a CPAP machine continued without any material changes putting his long-term health, and even his life, at risk.

E.    **The relevance of Mr. Burgos's "lifestyle" and "choices" to Dr. Bren's conclusions.**

On appeal, the government recycles the regrettable claim that Mr. Burgos makes "lifestyle choices" that contribute to his life-threatening hypertension. G27. This theory is a repackaged version of a familiar argument deployed by the Department of Justice in compassionate release cases. *See United States v. Mario R. Rivera-Rodríguez*, USDCPR No. 09-cr-345 (JAG), Docket No. 168 at 11-12, grant of compassionate release affirmed *United States v. Rivera-Rodríguez*, 75 F.4th 1 (1st Cir. 2023). Here, it was put forward first by government counsel as an

afterthought. SA326. What began as a prosecutor's argument was then adopted by Dr. Venuto in his second letter to the court below. SA467.

The government claims the court below agreed that Mr. Burgos was responsible for his hypertension due to consumption of high-sodium foods, refusal to do light exercise and misuse or disuse of blood pressure medications. The court did not say so, and the reasons given for denying compassionate release do not say this. AD1. These unfair and inflammatory claims were challenged and contested below. SA434-SA435, SA739-SA743.

To begin with, the claim made by Dr. Venuto and repeated as much as possible by the government that Mr. Burgos diverted or misused the diuretic Furosemide is incorrect and based on a hasty and incomplete reading of the medical record.[9] While it is true that there is a notation dated June 16, 2022, that indicates of this medication "Discontinue Reason: Diversion Issue/Misuse by patient," SA536, the notation appears

_____

[9] Incidentally, this also intimates that Dr. Venuto did not discuss this case with the physicians who actually treat and "interact" with Mr. Burgos, which Venuto and the government say is essential to judge Mr. Burgos's medical care. G36-G37, SA463.

to have been made in error, as *the medication was immediately prescribed again on the same date and dispensed daily thereafter.* SA535-SA536, SA623, SA655.

This, among other instances highlighted below, exposes the lack of care Dr. Venuto took in evaluating this medical record, leading to an irresponsible and disparaging accusation against Mr. Burgos that is untrue based on his perfunctory review of the medical record. The government presented no report, no disciplinary write up, no log-book entry, and no other evidence that Mr. Burgos misused Furosemide. Nothing suggests why or how someone would misuse this medicine. It is noteworthy that, although we showed below that this observation was mistaken, SA742-SA743, the government continues to repeat this debunked claim. G34.

Nor is there any credible record support for the claim that Mr. Burgos "refuses to do light exercise." G27. Dr. Venuto cites no source for this assertion, SA467-SA468, claims no relevant personal knowledge, and this alleged "refusal" is not mentioned anywhere in Mr. Burgos's medical record, SA54-SA268, SA335-SA405, SA529-SA733.

In reality, Mr. Burgos's "lifestyle choices" have been severely limited under the lockdown scenarios ubiquitous during the pandemic and that continue take place at BOP institutions on a regular basis.[10]

The government absolves itself of responsibility for Mr. Burgos's prison "lifestyle," including his food choices, G27, which are, of course, completely controlled by the BOP. The record does not show that the standard fare served to inmates at Coleman provides Mr. Burgos with any opportunity to make healthy food choices, nor does it show that nutritionally appropriate options are offered through its commissary.[11] If the BOP served appropriate food options, it would have said so as it would be unique among prisons for doing so.

_____

[10] Criminon, "What Are Prison Lockdowns and Why Are They Used?" Criminon, Criminon International, (25 Jan. 2024) www.criminon.org/who-we-are/groups/criminon-international/what-are-prison-lockdowns-and-why-are-they-used/ (documenting excessive prison lockdowns in BOP's USP Pollock, where Mr. Burgos was previously housed, and USP Coleman).

[11] Also, the idea that Mr. Burgos eats high sodium soup twice a day, G27 n.10, is not borne out by the government filed commissary receipts showing a handful of soup purchases over months, not sixty per month. SA412-SA420, SA469-SA517.

The high sodium content and abysmal nutritional quality of prison food in general, including food at regular meals and available at prison commissaries is well documented.[12] It is not surprising that "[i]ndividuals incarcerated experience nearly twice the risk of chronic

---

[12] Afsharian, Parisa "Beyond the Food: How Prison Nutrition Policy Contributes to Lasting Chronic Disease." Brown Undergraduate Journal of Public Health, Brown School of Public Health, (3 May 2023) https://www.sites.brown.edu/publichealthjournal/2023/05/02/beyond-the-food-how-prison-nutrition-policy-contributes-to-lasting-chronic disease/; Kuss, B., Lopez, N.V., Hardy, S.T., Spilkin, A., Brauer, J., Phillips, R., Delio, G. and Camplain, R "Sodium content of menu and commissary provisions in rural jail exceeds heart-healthy dietary recommendations," International Journal of Prisoner Health (25 November 2021) https://doi.org/10.1108/IJPH-08-2021-0087; Prison Voice Washington, "Correcting food policy in Washington prisons. Mountlake Terrace, (2016) https://www.prisonpolicy.org/blog/2017/ 03/03/prison-food/; Laura M. Rosenboom, Rebecca J. Shlafer, Jamie L. Stang, and Lisa J. Harnack, Evaluation of the Nutritional Quality of Commissary Foods Offered in American Women's Prisons, Journal of Correctional Health Care. Volume 24, Issue 3, 264-275 (1 July 2018) https://www.liebertpub.com/doi/10.1177/1078345818782474; Donovan, John. "Prison Food Is Way Worse than You'd Expect." HowStuffWorks, (17 May 2019) https://people.howstuffworks.com/prison-food.htm; Pauly, Madison. "The Surprising Benefits of Serving Prisoners Better Food." Mother Jones, (3 Mar. 2019) https://www.motherjones.com/crime-justice/2019/03/prison-food-health-commissary-strike-public-health-chronic-disease-pelican-bay/; Nargi, Lela. "Bad Prison Food Can Cause Health Problems That Linger after Release." In These Times, (12 Apr. 2022) https://inthesetimes.com/article/bad-prison-jail-food-punishment-health-problems.

diseases including hypertension and cardiovascular disease (CVD) relative to the general population, with hypertension being the most frequently reported chronic ailment in both prisons [and jails]."[13] Nor is it surprising that a Justice Department study found that 74 percent of inmates in state and federal prisons and jails are overweight, obese, or morbidly obese.[14]

While commissary purchases may be perceived as "optional," prisoners are forced to rely on commissary purchases to meet their needs generally, including food needs.[15] This is especially true with frequent lockdowns. During lockdowns, BOP policies provide for "alternative menus" of "a minimum bag meal consisting of one non-pork meat

---

[13] Kuss, B., Lopez, N.V., Hardy, S.T., Spilkin, A., Brauer, J., Phillips, R., Delio, G. and Camplain, R. (2021), "Sodium content of menu and commissary provisions in rural jail exceeds heart-healthy dietary recommendations," International Journal of Prisoner Health. https://doi.org/10.1108/IJPH-08-2021-0087.

[14] Maruschak, L., Berzofsky, M., & Unangst, J. (2015). Medical problems of state and federal prisoners and jail inmates, 2011-12. U.S. Department of Justice, Office of Justice Programs. https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[15] Raher, Stephen. "The Company Store: A Deeper Look at Prison Commissaries." Prison Policy Initiative, May 2018, https://www.prisonpolicy.org/reports/commissary.html.

sandwich with two ounces of protein, one no-flesh sandwich with two ounces of protein, one portion of fruit, and one beverage," which can be "water." BOP Program Statement P4700.06, Food Service Manual, pages 2, 29-30.

Mr. Burgos has experienced frequent extended lockdowns at the BOP, SA303, SA741, that include a steady diet of bologna and peanut butter and jelly sandwiches (alternate meals), forcing him and other inmates to purchase the nutrient-poor food at the BOP-operated commissary or go hungry.[16]

Blaming prisoners, like Mr. Burgos, for being hungry and eating what is available is "an ill-informed argument," one that's "unworthy of consideration by the court." *See e.g.*, *United States v. Williams*, 509 F. Supp. 3d 616, 623 (S.D.W. Va. 2020) (rejecting government's argument that inmate's "obesity is his own fault," that "even goes so far as to attach

---

[16] *See generally Mendez v. Breckon*, No. 7:20-CV-00046, 2021 WL 4268890, at *4 (W.D. Va. Sept. 20, 2021) (*pro se* civil action challenging frequent lockdowns and referencing an inmate strike refusing any bologna or peanut butter sandwiches for five days); *see also* Hindson, Brian. "Lockdown Meals." Prison Journalism Project, Prison Journalism Project, (19 Sept. 2023) https://www.prisonjournalismproject.org/2021/12/29/lockdown-meals/.

receipts of Mr. Williams's commissary purchases and critique his eating habits" and did not "serve to rebut" the conclusion that inmate's health was at risk.).

Notably, the government does not claim that Mr. Burgos has been prescribed or provided a modified medical diet suitable for his hypertensive condition, even though prisons are obligated to provide specially modified medical diets when necessary. *Feliciano v. Barcelo*, 497 F. Supp. 14, 36 (D.P.R. 1979) ("[I]nmates who require special medications or special diets are being cruelly punished when such medication or special diet is withheld."); *see also Scinto v. Stansberry*, 841 F.3d 219, 233 (4th Cir. 2016) (holding that prison officials have an obligation to provide inmates with "adequate food" including a medically appropriate diet when necessary) (citing cases).

If the BOP cannot provide Mr. Burgos with nutritionally appropriate meals and cannot control his hypertension with medication or other appropriate treatment, then it is evident that it has rendered him unable to provide self-care in the BOP environment; this constitutes extraordinary and compelling circumstances justifying compassionate release. U.S.S.G. § 1B1.13(b)(1)(B)(i) and (C). The poor food choices

prisoners are forced to accept in the BOP is yet another reason to expect that Mr. Burgos's health will improve if he is granted compassionate release, as he will have access to healthier food choices.

### F. The government clings to improper waiver arguments that cannot carry the day.

The government complains that our brief includes only one "bare sentence" asserting that updated medical records showed that the treatment deficiencies Dr. Bren identified continued after he was transferred to his current facility. G33. It then cites to *United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990), a government favorite, for the proposition that this "argument," was not developed and was therefore waived.

First, while legal claims or issues (often referred to as arguments) can be waived if not developed, "an argument," in the sense of part the reasoning that supports a claim, is not readily subject to waiver. *Zannino* considered a defendant's attempt to adopt "all the arguments" by other defendants "as each argument applies to this appellant," although these were not "readily transferable" to Zanino's circumstances. *Id.* at 17.

There, the word "argument" patently referred to legal claims and issues raised by other defendants in their briefs.

Here, however, there was no debate or "argument," so to speak, about Dr. Bren's conclusions and the discrete facts the medical record showed, or the abstract and unresponsive nature of the government's rejoinder. Even the court observed that the government had not adequately responded to Dr. Bren's report. A11. For months, the government did not assert that Mr. Burgos's treatment had changed after arriving to Coleman. It only did so at the eleventh hour, on its fourth try responding to the compassionate release motion almost eight months after it was filed. SA455. We immediately moved to strike, arguing, among others, that Mr. Burgos continued receiving the same medical treatment observed by Dr. Bren. SA736-SA739. We cited the filed medical record and quoted dates and results of blood pressure readings, SA737, dosages of specific medications by name, SA737, SA738, the long-standing diagnosis of sleep apnea and unfilled prescription for a CPAP machine, and contested the governments assertions, *see e.g.*, SA743.

The government responded but contested none of the specific assertions included in that motion. It just made generalized and

conclusory assertions and buzzwords like "wholly without merit," "simply unsupported by the medical record," "optimum medical treatment," and "highly detailed and probative," but zero details or substance. SA754-SA755. The evidence that the treatment Dr. Bren observed remained the same remained entirely uncontested and uncontroverted.

The government is therefore wrong that we had to "develop an argument" about this in our opening brief since the government did not develop any argument to the contrary below.[17] Those facts were included in our Statement of the Case, AB8-AB9, and referenced in our brief. AB41-AB45. An updated report by Dr. Bren agreeing with our contention that the medical record continues to show the same care noted previously, SA782-SA784, was also referenced in our brief. AB9-AB10, AB25-AB26.

The government is also incorrect that we had to "provide … argument in support of" the assertion that Mr. Burgos had been "hospitalized due to a hypertensive crisis." G33-G34. That fact was uncontested and included in the medical record. SA533 ("inmate … found

---

[17] We have gone into some detail on this matter in section A above, because the government spins the evidence and argues in a way it never did below requiring us to respond here.

to be in hypertensive urgency … blood pressure continues to be uncontrolled.").

### G.     On this record, the court was not free to ignore Dr. Bren's conclusions.

Under the circumstances of this case, the government is not correct in claiming that the district court was at liberty to ignore the uncontradicted statement of Dr. Bren based on *Parrilla v. United States*, 841 F.2d 16, 19 (1st Cir. 1988), or any of the other cases it cites in support. The 25-year-old *Parrilla* case involved a district court that rejected testimony contradicted by record evidence. *Id.* (describing the record evidence as "conflicting"). In passing, meaning in *dicta*, this Court mentioned that, even if uncontradicted, the court was not necessarily required to accept the testimony because it could have found it lacked credibility for other reasons. *Id.* That notion does not come into play here, however, since Dr. Bren's statement was neither contradicted by evidence, nor found by the court to lack credibility.

Interestingly, *Parrilla* cites another case, *Santana v. United States*, 572 F.2d 331, 335 (1st Cir. 1977), for the principle that a court need not necessarily accept uncontradicted testimony that it does not

consider credible. *Parrilla*, 841 F.2d at 19. While *Santana* stated that a judge is not ordinarily compelled to accept testimony, even uncontradicted testimony, it went on to note "[b]ut there are times when the record itself indicates that the trial judge ... has erred in his assessment," and concluded that "this is one of those rare cases." *Santana*, 572 F.2d at 335. *Santana* determined that, faced with advance notice of the factual contents of certain testimony, the opposing party's failure to produce contradicting evidence supported the conclusion that the trial court had erred in rejecting that testimony.

The same result applies here. Prior to the filing of the BOP physician's letter, even the district court noted that the government "ha[d] not adequately responded to … Dr. Bren's Report regarding [Mr. Burgos's] deteriorated and deteriorating health and BOP's inability to provide him with adequate care." A11, *see also* A14. It did not voice any misgivings or doubts as to Dr. Bren's credibility. And it gave the government seemingly endless opportunities to contest and contradict Dr. Bren's specific conclusions, A1, A9-A10, A12-A14, which it never did.

*Ortega-Candelaria v. Johnson & Johnson*, also cited by the government in aid of its theory that the court below was free to ignore

Dr. Bren's assessment, in fact cited the principle that a factfinder could "not arbitrarily refuse to credit the opinion of a claimant's treating physician." 755 F.3d 13, 25 (1st Cir. 2014) (citation, quotation marks omitted). It concluded, nevertheless, that the record contained contrary evidence that the factfinder was entitled to find "more persuasive." *Id.* at 28. Here, no evidence contradicted the medical findings, principles, and conclusions made by Dr. Bren. In short, the cases cited by the government do not support a court's arbitrary refusal to credit a statement without good reason.

Dr. Bren's analysis and his conclusions were neither improbable nor contradicted. While a factfinder may have some leeway to "reject uncontradicted, unimpeached testimony when it is improbable, inherently contradictory, riddled with omissions, or delivered in a manner giving rise to doubts," s*ee Gray v. Cummings*, 917 F.3d 1, 5-6 (1st Cir. 2019) (quoting *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76 (1st Cir. 2002)), the government has not shown that anything like that was true here. Nor has it shown that the district court believed it was.

Moreover, the principle that a factfinder should only reject testimony when there is an affirmative reason to doubt its validity is "particularly applicable" to the "testimony of an expert witness ... where the testimony bears on technical questions ... beyond the competence of lay determination." *Cruz-Vargas v. R.J. Reynolds Tobacco Co.*, 348 F.3d 271, 277 (1st Cir. 2003) (quoting *Quintana-Ruiz*, 303 F.3d at 76-77). The court below was not free to reject Dr. Bren's conclusions and observations out of hand.

### H. Mr. Burgos does not argue that the court was required to grant compassionate release.

The government claims that we argue Mr. Burgos "should have been granted compassionate release by default." G34-G35. We do not make that argument to this court, and that is not the remedy we seek on appeal. AB46. We argue only that the district court should have exercised its discretion based on an accurate appreciation of the record. It should not have unjustifiably rejected the credible, unimpeached, and uncontested assessment of Dr. Bren as weighed against the vague and generalized conclusions of a BOP physician about the adequacy of care provided in an institution under his charge.

CONCLUSION

Wherefore, this Court should reverse the order below and remand with instructions to reconsider the petition based on arguments already raised by the parties, supplementing only to ascertain Mr. Burgos's current health circumstances.

**Respectfully Submitted.**

In San Juan, Puerto Rico, on May 2, 2024.

**RACHEL BRILL**
Federal Public Defender

**FRANCO L. PÉREZ-REDONDO**
Assistant Federal Public Defender
Supervisor, Appeals Section

s/ *Alejandra Bird-López*
Assistant Federal Public Defender
First Circuit Bar No. 50164
241 F.D. Roosevelt Ave.
San Juan, Puerto Rico 00918-2441
Telephone: (787) 281-4922
Fax: (787) 281-4899
Email: Alejandra_Bird@fd.org

## CERTIFICATE OF COMPLIANCE

**1.** This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

**2.** This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using a 14-point Century Schoolbook font.

In San Juan, Puerto Rico, on May 2, 2024.

s/ *Alejandra Bird-López*
Assistant Federal Public Defender
First Circuit Bar No. 50164
Email: Alejandra_Bird@fd.org

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and exact copy of this Appellant's

Opening Brief was filed with the Clerk of Court using the CM/ECF

system which will send notification to all parties of record, including

counsel for the appellee:

> Mariana E. Bauzá-Almonte
> Assistant U.S. Attorney
> Torre Chardón, Suite 1201
> 350 José Chardón Ave.
> San Juan, P.R. 00918

In San Juan, Puerto Rico, on May 2, 2024.

> s/ *Alejandra Bird-López*
> Assistant Federal Public Defender
> First Circuit Bar No. 50164
> Email: Alejandra_Bird@fd.org